IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GOLDSTONE FINANCIAL GROUP, LLC and ANTHONY PELLEGRINO,<br><br>        Plaintiffs,<br><br>    v.<br><br>FINANCESCAM.COM<br><br>        Defendant. | Case No. 1:25-cv-07283-SRH<br><br>**JURY TRIAL DEMANDED** |

**MOTION FOR TEMPORARY RESTRAINING ORDER BRIDGING TO A PRELIMINARY INJUNCTION**

**Introduction**

Plaintiffs Goldstone Financial Group, LLC ("Goldstone") and Anthony Pellegrino (Mr. Pellegrino) move for a temporary restraining order bridging to a preliminary injunction against Defendant financescam.com ("FinanceScam") to cauterize the irreparable harm it is causing Plaintiffs through its false and defamatory campaign against them.

**Background**

Sometimes, it's all in the name. Such is the case here. Operating under the guise of conducting legitimate journalism, FinanceScam is an extortion racket whose business model relies on using generative AI to churn out false, negative, and defamatory content about its targets—in this case a small American business with which it has no connection—which it then posts across its Network of websites and social media channels. (ECF 1-1, identifying FinanceScam's media Network.) Websites operating under the FinanceScam umbrella include CriticalIntel.com, CyberCriminal.com, IntelligenceLine.com, and the YouTube channels @Anthony PellegrinoReview and @GoldstoneFinancialGroupReview.

To boost this content's visibility, FinanceScam registers domain names incorporating the names or trademarks of its targets to ensure it "gets maximum exposure." (ECFs 1 "Complaint" ¶ 25 and 1-1 at 24.) After saturating the internet with this content, FinanceScam pressures its targets to enroll in its "Citizen Advocacy Program." (Compl. ¶ 19.) Once a target "appl[ies] for the program" and "remit[s] payment," FinanceScam "purge[s]" the content and "appli[es] a firewall filter to deny any future content from being published against you." (Comp. ¶ 21.) FinanceScam warns that the only "legal" way to remove content is through its Citizen Advocacy program, and anyone else must be (1) "hacking our website," (2) "using fake DMCA notice," (3) "forging a court order," or (4) "attempting to bribe us." (Compl. ¶ 24.) FinanceScam falsely accuses Plaintiffs of each of these, while adding that Plaintiffs threatened to kill a FinanceScam "moderator" and her daughter. (Compl. ¶¶ 32–35.)

As detailed in the Complaint, FinanceScam is using all its wiles to extort payment from Plaintiffs by targeting them with hyperbolic, defamatory, and outright false "articles" masquerading as journalism. This content is escalating, and it is irreparably harming Plaintiffs, which warrants immediate injunctive relief.

### I. LEGAL STANDARD

The standards for a temporary restraining order and a preliminary injunction are the same. *Cassel v. Snyders*, 485. F. Supp. 3d 981, 991 (N.D. Ill. 2020). Under Fed. R. Civ. P. 65, preliminary injunctive relief is warranted when a movant establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "The first step in the analysis—the plaintiff's likelihood of success on the merits—is often decisive. . . . The district court may issue a

preliminary injunction only if the plaintiff demonstrates 'some' likelihood of success on the merits." *Braam v. Carr*, 37 F.4th 1269, 1272 (7th Cir. 2022).

The Seventh Circuit "uses a 'sliding scale' approach to preliminary injunctions: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Doe*, 43 F.4th at 791 n.4. In conducting its analysis, the Court "approach[es] the record from a neutral and objective viewpoint, assessing the merits as we think they are likely to be decided after more complete discovery and litigation." *Braam*, 37 F.4th at 1272.

## II. ARGUMENT

Fed. R. Civ. P. 65 exists to staunch irreparable injury from being inflicted on plaintiffs and the public while litigation is pending. Each *Winter* factor favors an injunction.

### A. Plaintiffs will be meritorious on every claim.

To obtain a TRO and preliminary injunction, a movant "must show that it has a better than negligible chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (internal quotation marks omitted). As a threshold matter, Plaintiffs will succeed on the merits because FinanceScam will almost certainly default. Indeed, it failed to respond to similar allegations in a complaint filed against it in California State Court earlier this year. *FDCTECH, Inc. v. IntelligenceLine.com*, 30-2025-01464030-CU-DF-NJC (Cal. Superior Ct. – Orange Mar. 11, 2025).

But even assuming FinanceScam makes an appearance, any objective reading of its content reveals its gambit and proves that Plaintiffs will succeed on the merits.

#### 1. *Plaintiffs will succeed on their cybersquatting claim [COUNT 1].*

The Anticybersquatting Consumer Protection Act (ACPA) prohibits registering a domain name that is identical or confusingly similar to the distinctive or famous mark of another with a bad faith intent to profit from the mark. 15 U.S.C. § 1125(d)). To succeed on a cybersquatting

-3-

claim, a plaintiff must establish that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a distinctive mark owned by the plaintiff; and (3) the defendant acted with a bad faith intent to profit from the plaintiff's mark. *Estate of Maier v. Goldstein*, 2017 WL 5569809, at *7 (N.D. Ill. Nov. 20, 2017).

As to the first factor, FinanceScam explained that it "set up" the following "8 websites":

> We have set up 8 websites –
>
> 1. anthonypellegrino.net
> 2. anthonypellegrino.org
> 3. anthonypellegrinogoldstonefinancial.com
> 4. goldstonefinancialgroupreviews.com
> 5. anthonypellegrinoreview.com
> 6. anthonypellegrinotruth.com
> 7. briankorienek.net
> 8. goldstonefinancialgroupreview.com
>
> With our skills, we will ensure that in the coming months, several of these will rank on page #1 on Google. Letting everyknow know the TRUTH BEHIND ANTHONY PELLEGRINO. It's typical Streisand Effect !!

(Complaint ¶ 36.)

Regarding the second, Mr. Pellegrino owns the valid and subsisting United States Trademark Registration Nos. 4,480,963 (the "'963 Mark") and 4,342,235 (the "'235 Mark"), which are both incontestable and registered on the Principal Register in the United States Patent and Trademark Office. (ECF 1-3.) The '963 Mark and the '235 Mark look like this:

| '235 Mark | '963 Mark |
|---|---|
| GOLDSTONE FINANCIAL GROUP | [GOLDSTONE FINANCIAL GROUP logo] |

In addition to these incontestable Marks, Plaintiffs own common law rights in the distinctive names "Anthony Pellegrino" and "Brian Korienek" in the context of financial advisory services. (*See* Compl. ¶ 47 ("Anthony Pellegrino is a name that has become synonymous with financial advisory services in the United States.")). FinanceScam's domain names incorporate these Marks with the *admitted* intention of trading off the goodwill they embody. (Compl. ¶ 52 ("With our skills, we will ensure that in the coming months, several of these will rank on page #1 on Google Letting everyknow know [sic] the TRUTH BEHIND ANTHONY PELLEGRINO"); ECF 2-4 ("If you file another fake DMCA, or threaten us, we will come up with 8 new cites.").) This satisfies elements two and three. *Estate of Maier*, 2017 WL 5569809, at *7. Plaintiffs have at minimum demonstrated a "better than negligible chance of success" on their cybersquatting claim. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1096 (internal quotation marks omitted).

### 2. *Plaintiffs will succeed on their Trademark Infringement Claim*

Beyond registering domain names that directly incorporate Plaintiffs' Marks, FinanceScam also weaves those Marks into its defamatory articles directly next to a link inviting Plaintiffs to "repair your reputation the correct way":



(Compl. ¶ 20.)

To succeed on a trademark infringement claim, a plaintiff must show "(1) its mark is protectable and (2) defendant's use of the mark is likely to cause confusion among consumers." *Venus Lab'ys., Inc. v. Vlahakis*, 2015 WL 1058264, at *2 (N.D. Ill. Mar. 5, 2015) (citing *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)). Plaintiffs easily satisfy the first element because they have incontestable federal registrations in the logo and word marks reproduced by FinanceScam and because they own common law rights in the names Anthony Pellegrino and Brian Korienek. (*See* Compl. ¶ 47.)

Plaintiffs satisfy the second element (confusion) because FinanceScam is using the Marks as "road signs" to divert unwitting consumers searching for Plaintiffs on search engines like Google to FinanceScam's malicious content. As the Court has explained:

> Imagine if McDonalds puts up a sign at Exit 7 saying "Burger King—Exit 7," but in reality Burger King is located at Exit 8. If there is, however, a McDonalds at Exit 7, McDonalds can benefit from the good will of Burger King because cars that exit the freeway at Exit 7 and do not see the Burger King may simply pull into the McDonalds rather than get back on the freeway. Even though the consumer is fully aware the McDonalds is not a Burger King, the initial confusion of where to exit the freeway allowed McDonalds to improperly reap the good will of its competitor.

*Pure Imagination v. Pure Imagination Studios, Inc.*, 2004 WL 2967446, at *8 (N.D. Ill. Nov. 15, 2004).

Further, in assessing the likelihood of confusion, courts consider "(1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs." *Venus Lab'ys., Inc.*, 2015 WL 1058264, at *3.

"[N]o one factor is decisive" but the "similarity of the marks, the intent of the defendant, and evidence of actual confusion are the 'most important factors' in a likelihood of confusion case." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). Here, at minimum, the marks are identical, both target U.S. consumers over the internet interested in financial advisory services, Plaintiffs' Marks are strong (as evidenced by the incontestable registrations), Plaintiffs have evidence of actual confusion (Pellegrino Decl. ¶ 9), and FinanceScam is operating in bad faith. No matter how the Court weighs the factors, they favor an injunction. *See id.*

By incorporating Plaintiffs' Marks into its content, FinanceScam is baiting search engine algorithms to promote and return the content, which in turn misdirects consumers searching for

Plaintiffs' Marks: a tactic FinanceScam *brags* about using. (Compl. ¶ 37 (("With our skills, we will ensure that in the coming months, several of these will rank on page #1 on Google[.]").) FinanceScam then trades off this goodwill by both attracting potential "subscribers" to its "Newsletters" (Compl. ¶ 24) and targets into its extortionate Citizen Advocacy Program. (Compl. ¶¶ 37, 74.) In short, it "improperly reap[s] the goodwill" Plaintiffs have developed in their marks by weaponizing the goodwill they embody *against* the Mark's owners. *See Pure Imagination*, 2004 WL 2967446, at *8.

But the thing most indicative of ultimate success on this claim is that Plaintiffs are *already aware of actual confusion*, something highly unusual at this early stage, and one of the "most important factors in a likelihood of confusion case." *Ty, Inc.*, 237 F.3d at 898; (Pellegrino Decl. ¶ 9.). Plaintiffs have demonstrated a likelihood of success on their trademark infringement claim.

### 3. *Plaintiffs will succeed on their Lanham Act false advertising claim.*

To succeed on a Lanham Act false advertising claim, a plaintiff must show "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result." *Dyson, Inc. v. Sharkninja Operating LLC*, 259 F. Supp. 3d. 816, 828 (N.D. Ill. 2017).

FinanceScam's scheme turns on its ability to trick consumers into believing it is a legitimate journalistic outfit committed to "hold[ing] bad actors accountable." (Compl. ¶ 81.) To do so, it falsely purports on its website to be a "team of journalists, investigators, and

activists" who leverage "public collaboration" to provide "accurate, quality reporting on crime and corruption" to "inform the public" and "assist compliance professionals." (Compl. ¶ 81.)

These statements are all false. In fact, FinanceScam is operated by a Ukrainian scam artist named "Viktor" who uses AI to churn out hyperbolic, defamatory content about financial advisory clients with the ultimate goal of extorting payment from them. (*See, e.g.*, Ex. 1.)

Those statements have a tendency to deceive consumers because they are outright lies and because, at first blush, FinanceScam's website appears legitimate. This deception is material because these consumers are more likely to substantively believe content published by an objective "team of journalists" than by Viktor, meaning they are more likely to revisit the Network and form a negative impression of the Plaintiffs. Ultimately, this harms both the consuming public and Plaintiffs since the former are led into believing the misinformation and, consequently, shun the latter. The beneficiary of all this is FinanceScam, which both attracts subscribers under false pretenses and, as a direct consequence, obtains great leverage to extort higher takedown payments from its targets.

### 4. Plaintiffs will succeed on the merits of their state law claims [COUNTS 4-6]

In addition to their federal claims, Plaintiffs assert three Illinois state law claims: defamation *per se*, false light, and trade libel. The elements of these claims are substantially similar: collectively, they require showing that FinanceScam's malicious conduct cast Plaintiffs in a false light before the consuming public to their detriment.[1]

---

[1] As relevant here, Illinois defamation *per se* merely requires that a plaintiff show the defendant published a false statement imputing either (1) the commission of a crime, (2) an inability to perform or want of integrity in performing employment duties, or (3) a lack of ability or that otherwise prejudice a person in his or her profession or business. *Svanaco, Inc. v. Brand,* 417 F. Supp. 3d 1042, 1061 (N.D. Ill. 2019). The elements of Illinois false light are that (1) the defendant's actions placed the plaintiff in a false light before the public, (2) the false light would be highly offensive to a reasonable person, and (3) the defendant acted with actual malice.

FinanceScam's statements fit these elements like a glove. As representative examples, it has published the following statements across the Network:

- "Anthony Pellegrino and his Reputation Managers are blatantly committing serious crimes in trying to censor information on Google."

- "Anthony Pellegrino hired hackers to hack multiple websites, and file dozens of fraudulent copyright takedown notices since April 2023."

- "Anthony Pellegrino – Forging Court Orders and Judge's Signature"

- "At this time, while everyone in Ukraine is fighting on multiple fronts, we have another front to fight on. And that's taking down scumbags like Anthony Pellegrino and Goldstone Financial Group, who would forge court orders, impersonate a judge, impersonate a lawfirm, threaten to kill a 7 yr old girl and wish that Russians kill Ukrainians like us."

- Accusing Plaintiffs of committing "Fraud, Impersonation, and Perjury."

- "Anthony Pellegrino the Fraudulent Mastermind Behind Goldstone's Collapse."

- Accusing Mr. Pellegrino of "herding [clients] into a slaughterhouse for secret profits" which "transformed Goldstone into a parasitic entity, feasting on the trust of those it was meant to protect."

- Claiming Plaintiffs' actions "extinguish[ed] hope, leaving a legacy of anguish" and "reveal[] the festering underbelly of unchecked avarice."

(Compl. 91, 93.)

These statements are false. (Pellegrino Decl. ¶¶ 7, 8.) *See also Svanaco*, 417 F. Supp. 3d at 1061 (quoting *Gertz v. Robert Welch*, Inc. 418 U.S. 323, 339-40 (1974)) ("a speaker cannot just couch a false assertion of fact in terms of an opinion and thereby evade liability. Thus, a statement is only protected as a fact if it 'can be reasonably interpreted as stating actual fact.'"). They are facially highly offensive to any reasonable person. And they have caused and are

---

*Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 799 N.E.2d 916 (2003). The elements of trade libel/commercial disparagement are that the defendant (1) made a false and defamatory statement, (2) the statement was published to a third party, (3) the plaintiff's business suffered actual damages as a result, and (4) the statement was made with actual malice or reckless disregard for the truth. *Allcare, Inc. v. Bork*, 176 Ill. App. 3d 993, 531 N.E. 2d 1033 (1988).

causing actual and irreparable harm to Plaintiffs' business and reputation.[2] (Pellegrino Decl. ¶¶ 9, 10.) Finally, FinanceScam made these statements with the malicious and express purpose of damaging Plaintiffs' reputation, such that it would pay to take the content down. (Compl. ¶¶ 36-37.)

\* \* \* \* \*

FinanceScam's undisputed, publicly accessible content establishes that Plaintiffs will succeed on each of their claims. Each additional *Winter* factor also supports injunctive relief.

### B. Goldstone is actively suffering irreparable harm which will compound without injunctive relief.

This case is what preliminary relief was made for. FinanceScam, an overseas scammer, is actively damaging Plaintiffs' reputation, goodwill, and costing it business. (Pellegrino Decl. ¶¶ 9, 10.) *See, e.g.*, *Opticians Ass'n of Am. V. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) ("[I]rreparable harm is typically found in a plaintiff's loss of control over their business reputation, loss of trade and loss of goodwill."). Plaintiffs have no adequate remedy at law for this conduct.

Further, In the Seventh Circuit, there is a "well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). This presumption stems from an understanding that the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *7-Eleven, Inc. v. Spear*, No. 10-CV-6697, 2011 WL 830069, at \*6 (N.D. Ill. Mar. 3, 2011)

---

[2] IntelligenceLine, one of the domains listed on Exhibit A to the Complaint, purports to have a daily reach of over 100,000 people. https://www.intelligenceline.com/criticalintel/. FinanceScam.com's page on Mr. Pellegrino purports to include comments from thirty-eight individuals. https://www.financescam.com/dossier/anthony-pellegrino/. FinanceScam's YouTube videos have been viewed at least a combined 75 times. https://www.youtube.com/@GoldstoneFinancialGroupReview/videos; https://www.youtube.com/@AnthonyPellegrinoReview. These totals are increasing daily.

and *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988). Indeed, "irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013). Yet here, Plaintiffs' showing goes beyond the presumption since it can demonstrate actual, immediate, and continuing harm to its business. (Pellegrino Decl. ¶¶ 9, 10.)

This case also warrants both a bridge TRO and a preliminary injunction because FinanceScam has threatened to escalate its campaign against Plaintiffs. (*See, e.g.*, ECF 2-4 (threatening to "come up with 8 new sites."); Compl. ¶ 52 ("With our skills, we will ensure that in the coming months, several of these will rank on page #1 on Google. Letting everyknow know [sic] the TRUTH BEHIND ANTHONY PELLEGRINO"); Compl. ¶ 36 ("You as [sic] – Why 8 websites? . . . IMHO, 8 is not enough.").) Indeed, upon learning of this lawsuit on July 8th, FinanceScam threatened to further disseminate its content "starting tomorrow" since "it's best if the world knows the truth." (Ex. 1.) These threats to escalate the campaign, combined with the previous threats to register additional domains, strongly favor immediate injunctive relief now that FinanceScam is aware that Plaintiffs are fighting back.

### C. FinanceScam has no relevant "equities" in this matter.

All available evidence indicates that FinanceScam is an overseas scammer that has no good faith basis for any of its conduct. In contrast, Goldstone—an American business that employs nearly fifty people in the greater Chicago area—is actively being destroyed by FinanceScam's malicious falsehoods. (Pellegrino Decl. ¶¶ 9, 10.) Simply put, other than protecting its illicit business, FinanceScam has *no* equity in this matter. *See Monex Deposit Corp. v. Gilliam*, No. SACV 09-287-JVS(RNBx), 2010 WL 2349095, at *7 (C.D. Cal. June 1, 2010) (broadly enjoining

extortion and defamation). This balance unilaterally favors Plaintiffs.

### D. Preliminary relief is in the public interest.

Finally, the public has an interest in truthful information about professional financial advisory services like Plaintiffs. It has an interest in distinguishing between legitimate journalism and scammers. And it is in the public interest to prevent consumer confusion. *See Kraft Foods Holdings, Inc. v. Helm*, 205 F. Supp. 2d 942, 952 (N.D. Ill. June 7, 2002) (The public interest "is served . . . because enforcement of the trademark laws prevents consumer confusion.").

FinanceScam, however, is actively confusing the consuming public by hijacking Plaintiffs' Marks and reputation to disseminate its false, deceptive content under the guise of providing a public service. This factor favors an injunction. *See, e.g.*, *Int'l Profit Assocs. v. Paisola*, 461 F. Supp. 2d 672, 680 (N.D. Ill. 2006) (entering a TRO to staunch the spread of defamatory statements). *See also Int'l Kennel Club*, 846 F.2d at 1092 n.8 ("[T]he relevant consideration [in determining whether the public interest will be disserved by the grant of an injunction] is the consumer's interest in not being deceived[.]") (quoting *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 909 (7th Cir.1986)).

\* \* \* \* \*

Plaintiffs have demonstrated an overwhelming likelihood of success on each of their claims. That alone favors granting an injunction, since each successive *Winter* factor becomes progressively less important following a strong showing on factor 1. Not that it matters, since every factor supports preliminary relief. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (applying sliding scale approach to affirm grant of a preliminary injunction); *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 439 (N.D. Ill.

2019) (granting preliminary injunction and temporary restraining order on a trademark claim because balance of factors favored injunctive relief).

E. **Plaintiffs should not be required to post a bond.**

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Courts have discretion in setting the amount of the bond, including discretion to set no bond at all. *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1066 (S.D. Ind. 2010) (citing *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972).

Plaintiffs have more than sufficient financial resources in the unfathomable event that this motion results in an improvidently granted injunction. A bond is superfluous in these circumstances. *See CDW LLC*, 722 F. Supp. 2d at 1066 (determining a bond was not necessary where the plaintiff was "a corporation in good standing and has made a strong showing that it is likely to succeed on the merits of its trademark infringement claim").

Further, no one, and especially not FinanceScam, will suffer any cognizable harm that isn't of its own making if the Court grants the requested preliminary injunctive relief and stops its deceptive and infringing activities. *See, e.g., Helene Curtis Indus. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977) (recognizing that any burden upon willful infringers resulting from preliminary injunctive relief is self-inflicted).

III. CONCLUSION

For the reasons explained above, Plaintiffs request a TRO pending a hearing and adjudication of a preliminary injunction, which in all likelihood will ultimately mature into a permanent injunction following FinanceScam's default, that prevents FinanceScam from:

(1) registering and using any internet domain or social media channel that incorporates, or is confusingly similar to, Plaintiffs' Marks;

(2) transferring any of the Network domains and channels (identified in ECF 1-1) pending final adjudication of this case, and then ordering those domains and channels transferred to Plaintiffs;

(3) making any effort to extort consideration from Plaintiffs by threatening to publish or publishing any negative statement about Plaintiffs or their employees;

(4) publishing, republishing, maintaining, or operating any website, including but not limited to those identified in ECF 1-1, that contains statements impugning Plaintiffs' professional integrity or character, or implying or stating they have undertaken illegal, unlawful, unethical, immoral, or otherwise improper conduct;

(5) using Plaintiffs' Marks in any manner, and

(6) using search engine optimization techniques to create the false impression that anything FinanceScam continues to publish is more popular than it actually is.

Dated: July 11, 2025

/s/ *James J. Saul*
James J. Saul
**FAEGRE DRINKER BIDDLE & REATH LLP**
320 South Canal Street
Suite 3300
Chicago, IL 60606
312 356 5053
james.saul@faegredrinker.com

*Attorney for Plaintiffs Goldstone Financial Group and Anthony Pellegrino*